IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

EMMITT G. ROSCOE,            )
    Plaintiff,               )
                         )   Civil Action No. 7:18-cv-00319
v.                          )
                         )
J. D. BENTLEY, *et al.*,      )   By:  Elizabeth K. Dillon
    Defendants.              )        United States District Judge

**MEMORANDUM OPINION**

    Emmitt G. Roscoe, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983.[1]  After some claims and defendants were dismissed, the matter was tried before the court only as to Roscoe's First Amendment retaliation claim against defendants James Bentley and Nicholas Perrigan.  In broad terms, Roscoe alleges that defendant Perrigan filed a false disciplinary charge against him in retaliation for Roscoe's asking for informal complaint forms and for Roscoe's saying he wanted to file a complaint of misconduct by another officer, Gabriel Stevens, under the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301–30309.  He further claims that defendant Bentley, who investigated Roscoe's PREA complaint and deemed it unfounded, retaliated against him for filing the PREA complaint when Bentley filed a disciplinary charge against Roscoe accusing him of making a false PREA report.

    A three-day bench trial was held on March 9, 10 and 11, 2021.  Based on the stipulations and evidence presented, the court sets forth its findings of fact and conclusions of law below.  Because the court concludes that Roscoe did not meet his burden of proof regarding the causation element of his retaliation claims, the court will enter judgment in favor of defendants.

---

[1]  The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2007).

## I.  STANDARD OF REVIEW

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury. The trial judge must appraise the testimony and demeanor of witnesses, as well as weigh the evidence and choose, among conflicting inferences and conclusions, those that seem most reasonable.  *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964).  In this regard, the trial court is in a unique position to evaluate the credibility of witnesses and weigh the evidence accordingly.  *See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013) (citing *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 855 (1982)).  The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias.  *Id*. (citation and internal quotation marks omitted); *see Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (internal quotation omitted) (stating that the factfinder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses).

A trial court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings. . . .  The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

## II.  TESTIMONY AND OTHER EVIDENCE

At the time of the events in this lawsuit, Roscoe was an inmate in the custody of the

Virginia Department of Corrections (VDOC) and was housed at Red Onion State Prison (Red Onion). Defendant Perrigan was a correctional officer employed at Red Onion and was fairly new to VDOC; he had been employed there only since 2016. Defendant Bentley was employed at Red Onion as an investigator, and one of his responsibilities was to investigate PREA complaints made by prisoners against other prisoners or staff. At the time of these events, Bentley had worked for VDOC for approximately twenty years.

The court summarizes here the most important testimony from most of the witnesses, and discusses exhibits and stipulations of the parties in context as appropriate, regardless of whether an exhibit was introduced through a particular witness. The court does not include all of the testimony from trial and omits unimportant or tangential testimony. Moreover, the court does not discuss any evidence relevant to the issue of plaintiff's damages because it finds that plaintiff has not established that either defendant violated his constitutional rights.[2] Thus, it is not necessary to reach the issue of damages.

## A.  Emmitt George Roscoe, Jr.

Roscoe testified first. He said that, at approximately 7 p.m. on January 7, 2018, Sergeant Tonia Phillips,[3] defendant Officer Perrigan, and Officer Stevens were making rounds in his pod. At the time, Roscoe was housed in cell B117 with his cellmate, Ronald Perry, and the pod was locked down so all offenders were in their cells. Roscoe stopped Phillips and the two officers and asked Phillips for an informal complaint. He directed his request to Phillips, because she was a sergeant and would have had the informal complaint forms. At that time, correctional officers did not hand out those forms.

---

[2] This includes the entirety of the testimony of witness Jonathan Gibson, a cognitive counselor at Red Onion.

[3] This individual's surname at the time of trial was Phillips. In January 2018, though, her surname was Marsee. The court uses Phillips throughout its opinion to refer to this individual, regardless of the name stated by any witnesses.

Roscoe alleges that Phillips told him that they were sick of him and all of his informal complaint filing and that he should pack up his stuff because he was going to segregation. When Roscoe asked what he had done that warranted sending him to segregation, she told him that he was going to segregation for asking for an informal complaint. She then told him that she did not know why he was going to segregation, but she would "figure something out."

A few minutes later, Stevens came back to the door and asked Roscoe why he wanted informal complaint forms. Before Roscoe could answer, though, Stevens assumed Roscoe was going to complain about not getting recreation and asked why Roscoe would complain about that since it gave him "more time to f**k his cellie." Roscoe said he did not address what Stevens had said at the time, but instead went back to his bed.

Then the officers came back to his cell door a third time. During the third visit, Stevens apparently asked why Roscoe had been kicking the door, and Roscoe responded that he was on the bed, so how could he be kicking the door. Stevens then asked Roscoe to come to the cell door, which he did. At that point, Stevens again said "sexually perverted" things to Roscoe, although Roscoe did not specify what was said. At that point, Roscoe got into a "verbal argument with the staff," and Roscoe advised that he wanted to make a PREA complaint for the things Stevens had said to him.

Roscoe introduced into evidence a video (without audio) that shows the officers initially making rounds and stopping at Roscoe's cell. (Pl.'s Ex. 5, at 19:05.) The video also shows Stevens coming alone to Roscoe's cell, (*id.* at 19:10:04), and Roscoe and Perrigan coming together to Roscoe's cell, (*id.* at 19:11:53).

At about 8 p.m., Captain Still came to the door and brought Roscoe out of the cell to talk to him at the table in the pod. He asked Roscoe about the PREA complaint and what had happened. After Roscoe told him that he still wanted to make a PREA complaint, Captain Still

4

said that he had been told to take Roscoe to segregation.  The next morning, Roscoe received a disciplinary charge, written by defendant Perrigan, stating that he had been kicking his door.  Specifically, Perrigan charged Roscoe with a 120B offense, which is a "very serious charge" for tampering with a security device.  (*See* Pl.'s Ex. 4 (disciplinary offense report ROSP 2018-0020).)  Roscoe insisted that at no time had he ever kicked his cell door.

Roscoe then described that it took days of asking repeatedly for him to finally be given access to a phone to make a PREA complaint, and the first opportunity he had to call the PREA hotline was on January 11.  After he called the hotline, defendant Bentley came to see Roscoe, which was on January 18.  Roscoe then conveyed the same information to Bentley and gave him a written statement about Stevens's comments to him on January 7.

Roscoe testified that during the interview, Bentley told Roscoe that he could have kept the complaint "in house," which Roscoe interpreted to mean that he did not want Roscoe complaining to an "outside agency," like the PREA hotline.   According to Roscoe, before he could even provide his written statement, Bentley told him that he would be charging him for making a PREA complaint.  Bentley did not say he was charging Roscoe for lying or for doing anything wrong, but just for filing the complaint.

Roscoe also relies on VDOC's Operating Policy (OP) concerning PREA, which states, "An offender who makes a report of . . . employee sexual misconduct or harassment that is determined to be false, may be charged with a disciplinary offense if it is determined the report was made in bad faith following consultation of the PREA Analyst."  (Pl.'s Ex. 1 at 8, § E(1)(f).) It continues, "Offender shall not be charged for reports of sexual abuse made in good faith based on a reasonable belief that the alleged conduct occurred.  Such a report shall not constitute falsely reporting an incident or lying even if an investigation does not establish sufficient evidence to substantiate the allegation."   (*Id.*)

5

Roscoe takes issue with the fact that Bentley never informed him that he believed the charge was in bad faith.  Instead, Roscoe insists that the only reason the charge was written was because Bentley was upset that Roscoe did not keep the matter "in house."

There were several aspects of Roscoe's testimony that the court did not find credible, particularly when considered in light of all the evidence in the case.  For example, the court believes that he was, in fact, kicking his cell door on January 7, at least on the first visit that Phillips and the two officers made to his cell.  The court also finds that neither Stevens nor Bentley made the respective comments that he attributes to them.  It finds that other witnesses offered more credible testimony as to these events.

Roscoe's credibility was undermined, in part, by his statement, in testimony near the end of the trial, that he had not cursed at any of the officers in the pod on January 7.  He already had admitted several times that he had cursed at them, and he then changed his story about that.

His credibility also was undermined by his insistence that all of the officers who did rounds (twice each hour) when he was in segregation between January 8 and January 11 refused to provide him with informal complaint forms and refused to allow him to access the phone to make a PREA report.  For this to be true, it would mean that all of those officers making rounds on those days (in addition to Stevens, Perrigan, and Phillips previously), violated VDOC rules repeatedly, all to prevent him from making a PREA report or filing an informal complaint.  On its face, this is simply not believable.  Roscoe tried to support his assertion by saying that the word must have been passed down to the officers to deny him the phone and forms, but that is mere speculation and he presents no credible proof of such a far-reaching conspiracy.

**B.  Defendant Nicholas Perrigan**

Officer Perrigan joined VDOC in 2016, so he had been employed only a few years at the time of the January 7, 2018 events.  He testified that when Sgt. Phillips, Officer Stevens, and he

began their rounds that evening, there was kicking and shouting coming from cell B117, the first-floor cell where Roscoe was housed, so they directed their attention to that cell to see what the problem was.  Stevens reapproached the cell a few minutes later because the disruptive behavior did not cease.  At that time, Perrigan was upstairs in the pod.  Perrigan and Stevens later approached the cell together, but Perrigan did not recall what was discussed.

Perrigan testified that when he approached the cell door to B117, he saw it shaking and moving and knew that it was being kicked or beaten.  At that time, he also saw Roscoe's face in the window of the cell.  Based on those facts, and, after a discussion with Phillips, Perrigan wrote the disciplinary charge against Roscoe.

At the disciplinary hearing for the charge, Perrigan first said that he could not determine whether it was Roscoe or his cellmate who was kicking the door.  But he noted that Roscoe was the person who had a conversation with the sergeant earlier.  He also stated that he could see the door vibrating and when he got to the door, Roscoe was standing in front of it.   He also told the hearing officer that Roscoe had told him that he had the energy to kick the door "all night long." Perrigan admitted to the hearing officer, though, that he had not included that statement in the charge.   Ultimately, hearing officer Mullins dismissed the charge because Perrigan "could not say that [Roscoe] was the offender who was kicking the door of cell B-117."  (Pl.'s Ex. 4 at 2; *see also* Pl.'s Ex. 24, Part 2 (audio recording).)

Roscoe made much of the fact that the charge was dismissed, and he emphasized throughout trial that Perrigan admitted, during the disciplinary hearing, that he did not see Roscoe kick the cell door.  But Stevens and Phillips, who were also present, credibly testified that they could tell that it was Roscoe's cell door that was being kicked, and that, although they could not see his feet actually kicking the door (because the door is not see-through except for a narrow window that would begin above most prisoners' waists), it was Roscoe that was standing

in front of the door at the time they heard it being kicked and saw it vibrating.  That was the same explanation Perrigan gave at the disciplinary hearing as to why he believed it was Roscoe. Essentially, there was strong circumstantial evidence that Roscoe was kicking the door, even though no one saw his feet making contact with it.  Thus, the court finds that Roscoe was, in fact, kicking the door.

Perrigan also testified that he has never been disciplined and that he did not then—or ever—retaliate against Mr. Roscoe.  He testified that if he had retaliated against Mr. Roscoe, he could be fired, because VDOC has zero tolerance for retaliation.

The court finds that Perrigan's recollection of events was generally weak.  The court also finds that there were portions of Perrigan's testimony that the court found troubling or unbelievable.  For example, Perrigan testified that, even though he did not actually see Roscoe's feet kicking the door, Roscoe admitted his guilt that evening by saying, several times, that he could kick the door all night long because he was young and had the energy to do so.  As noted, Perrigan did not include those statements in the disciplinary charge, nor did he include them in an affidavit he previously submitted in court, which Roscoe introduced into evidence.  (Pl.'s Ex. 28.)

The court is unsure whether Roscoe made those comments, but the court would reach the same decision regardless.  While observing Perrigan testify, it seemed that he was not actually remembering that Roscoe made such statements.  Instead, he was relying on his own recorded statement at the disciplinary hearing for the charge, after hearing it played in court, in which he told the hearing officer that Roscoe had made that statement.  Indeed, he testified, in defendant's case, that hearing that recording brought those statements by Roscoe back to his memory.  It is possible that Perrigan did not include Roscoe's statement in his report because Roscoe did not

make them and Perrigan made it up at the disciplinary hearing to bolster his assertion that

Roscoe kicked the poor.

It is also possible, of course, that Roscoe made those statements and that Perrigan simply

failed to include them in his report.  But Perrigan's explanation as to *why* he did not include

Roscoe's statements in his report was unconvincing.  He basically testified that he was busy and

had to get the disciplinary charge written in a timely manner.  He also stated that it would have

taken 30 to 45 minutes to include in his report that Roscoe admitted to the conduct.  He said he

would have had to put exactly what Roscoe had said, and, because there was so much that was

said, he would have a lot to write.  When pressed, though, he could not remember any other

statements by Roscoe.  He also testified that he did not have time to review the video evidence

for this charge, as he normally would in trying to be thorough, because of the "extra duties" he

had to perform that night.  He identified those duties as including packing up and making an

inventory of all of Offender Perry's and Roscoe's property to move to segregation.  That does

not make sense to the court because most, if not all, times that a prisoner is moved to segregation

there will be a report to write.  It seems like the two occurring together would be a fairly

common occurrence.

Overall, then, there were portions of Officer Perrigan's testimony that the court did not

find convincing.[4]  As to the key question of motive, however, the court does not find that Roscoe

has proven Perrigan wrote the charge in retaliation for Roscoe's asking for informal complaints

---

[4] Perrigan also failed to follow the VDOC policy that required him to write an incident report.  Perrigan testified that he did not know at the time that he had to write both an incident report and a disciplinary report; he thought the disciplinary report could be written in lieu of an incident report.   His explanation for that failure was likewise not credible.  Perrigan effectively stated that he was very busy with both the incident concerning Roscoe and the incident the same shift with Offender Perry, who also was disruptive.  He now knows that it is not the correct thing to do per policy, but at the time he thought he could write the charge in lieu of an incident report.

Perrigan also admitted that he had not properly understood the term "stacking charges" and when charges from the same incident could be brought.  He learned during trial, based on the testimony of other witnesses, that he could have written charges both for tampering with a security device and for threatening bodily harm.  He testified that, at the time, he thought that would have been stacking charges and impermissible.  So, he elected to charge Roscoe with the more serious of the offenses.

or in retaliation for Roscoe's allegedly saying he wanted to file a PREA complaint.  Instead, the court believes that Perrigan wrote the charge because Roscoe was kicking the door and otherwise being disruptive.

### C.  Officer Gabriel Stevens

Officer Gabriel Stevens testified next.  Stevens has been an officer at Red Onion for approximately five years.  He explained it as a prison that houses approximately 800 offenders, whom he described as "very violent offenders."  He speaks with a lot of offenders on a daily basis on each 12-hour shift.

Officer Stevens was a fairly credible witness.  He emphasized that he knew Roscoe was kicking the door because Roscoe was standing at the door when Stevens could see it vibrating from being kicked.  The court also believed his denials about the sexual conversations.  Stevens expressly denied that he had made any type of sexually suggestive comments to Roscoe or any comments about Roscoe needing more time to have sex with his cellmate.  He also credibly testified that he had always been professional with Roscoe and with other inmates.  He also testified that Roscoe was being disruptive, and he went to talk with him to figure out what his issue was.

Stevens testified at one point that he did not see Roscoe physically kicking the door.  But he later clarified that he saw Roscoe in the window of the cell so assumed he was the one kicking the door because the cell door is where the kicking was coming from.  He also stated that Roscoe was being disruptive in general on that evening.

Stevens could not remember exactly what the topics of the conversations were that he had with Roscoe that evening, but he knew that he did not make the sexually-tinged statements attributed to him by Roscoe.  He stated that he has "always been professional" and that he had "never made a comment like that to any offender."  Although he did not remember what the

conversation was about, he was certain that he would have remembered had he made such a comment.  Because he does not make comments like that, he is certain that he did not say what Roscoe says he did.

Stevens also testified that it is a common occurrence for offenders to ask for informal complaint forms and that he has never seen Sgt. Phillips, or any other sergeant, refuse to give one.  He explained that occasionally, a sergeant might not have enough forms with her and might have to request them after her shift and give them out the next shift, but he never saw a refusal to provide one.  He further noted that Phillips would write her name on informal complaint forms and include the date the form was given, which allowed her and others to track more easily where the complaint forms came from.

Overall, the court found Stevens' testimony credible.[5]  Moreover, the court does not find it believable that Phillips, Stevens, and Perrigan—or any subset of them—conspired to come up with a charge as an excuse to be able to send Roscoe to segregation.  Instead, the court believes it is more likely than not that Roscoe was kicking his door that evening and otherwise being disruptive, and that was the reason for the charge.  The court also finds that Roscoe has not

---

[5] As with portions of Perrigan's testimony, however, there were details of Stevens's testimony that were problematic.  For example, Stevens testified that he did not know that he could write a staff member up for misconduct.  Although he said he had no reason to write any supervisor up because he had not seen misconduct, the fact that he stated that he did not know he could report other staff members for misconduct is troubling.

Stevens also testified that he did not recall Roscoe telling him on January 7 that he wanted to file a PREA complaint.  Although the court believes Stevens, Roscoe tried to show, by using a document written by Stevens, that Roscoe had made verbal statements about filing a PREA report on January 7.  In an affidavit filed earlier in the case, Stevens explained that he did not believe he needed to write an incident report because he did not write the charge.  Thus, he said that he never wrote an incident report.  (Pl.'s Ex. 26.)  Plaintiff focused, though, on a document titled "Incident Report" written by Stevens, which describes his interactions with Roscoe on January 7.  (Pl.'s Ex. 27.)  In that document, Stevens twice denied that any sexual statements were made.

It is unclear *when* that incident report was written, however.  Stevens acknowledged it was dated January 7 and testified that he wrote it on January 7, but the court believes he was mistaken.  Instead, the court believes that "report" was the written statement that Stevens provided to Bentley as part of the PREA investigation.  Indeed, it is word-for-word the same as the report Bentley said Stevens gave him as part of the investigation.  If the court is correct about that, then it makes sense that the statement twice denied that any sexual comments were made.  But based on Stevens' trial testimony that he wrote it on January 7, Roscoe questioned him about why he included this in his report if Roscoe had not accused him of sexual misconduct on that date.  In response, Stevens stated that he puts similar statements in a lot of his reports, which the court did not find believable.

proven that Stevens made the comments attributed to him.  Stevens flatly denied it, and the court finds his denial credible.

## D.   Sgt. Tonia Phillips

Tonia Phillips, who is now retired from VDOC, worked for VDOC for 22 years.  At the time of these events, she was a sergeant.  She testified that occasionally she would not have sufficient informal complaints to give out, and in that circumstance, she would have to request them and then pass them out the next night.  But she also testified that she never denied an offender an informal complaint and that she never had a reason to do that.  It did not bother her to give out informal complaints.  She also testified that she would initial informal complaint forms and date them before she passed them out.  She testified that an offender's asking for an informal complaint would never be a reason to write him up.  Instead, giving out those forms were just part of her job.  She did not even have to respond to them, so it did not make more work for her to give out the forms.

With regard to the events of January 7, 2018, she recalled that she saw the door to Cell B117 shaking from being kicked and Roscoe standing at the door.  She testified that she eventually asked Capt. Still for permission to lock Roscoe up and she instructed Officer Perrigan to write a disciplinary charge for Roscoe.  Like Stevens, she was a credible witness as to the key issues in the case.

## E.   Captain David Still

David Still, a corrections captain at Red Onion, testified that he had signed the DOC-11 form (Pl.'s Ex.14) that was used to transfer Roscoe to RHU segregation on January 7.  That form stated that staff had reported Roscoe was kicking his cell door.  (*Id.*)  He offered evidence relevant to damages, but otherwise his testimony did not add much to the case.  He had little recollection of what had occurred, what was said, or what he did to investigate.  Roscoe referred

Still to Plaintiff's Exhibit 4, the document in which Roscoe's disciplinary charge for kicking the door was deemed unfounded, and in particular, to the statement that "Perrigan cannot say E. Roscoe 142209 was the offender kicking the door in cell B117."

In response to questioning, Still said he probably would not have locked Roscoe up that night if Perrigan had told Still (as he told the hearing officer) that he did not see Roscoe kicking the door. Even so, Still's testimony does not support any finding that Perrigan's filing of the charge was done for a retaliatory motive.

### F.   Inmate Witnesses (Perry, Starling, Whitehead)

Roscoe called three inmate witnesses in his case-in-chief. They each testified briefly, and their testimony largely echoed Roscoe's testimony about the events of January 7, 2018, although they were not entirely consistent.

Roscoe's cellmate on January 7, Ronald Perry, testified that Roscoe asked Sgt. Phillips for an informal complaint form and she refused to give him one. She instead told Roscoe that she was going to send him to segregation for asking for an informal complaint. Perry further testified that at no point that evening did he see Roscoe kicking the door of the cell. He testified that he remembered the officers coming to the cell door twice that night. The first time was the time when the sergeant denied him an informal complaint and threatened him with segregation. The second time, Perry said that he heard one of the officers say he wanted to spend some one-on-one time with Roscoe and started licking his lips. He thought the officer's name was Stephenson.

Inmate Francis Starling was an inmate that was housed in Roscoe's pod. He testified that there was a "big commotion" at Roscoe's cell on that date. That statement, of course, could support a finding that Roscoe was creating a disturbance. Starling also testified that Sgt. Phillips told Roscoe that he could ask for an informal complaint and PREA call from "the hole," *i.e.*,

13

segregation.

Inmate Clyde Whitehead testified that he heard Roscoe ask for an informal complaint and that Sgt. Phillips told Roscoe that she was sick of him and his informal complaints and that she was going to lock him up. Then, another officer came to the door and got "into it" with Roscoe. Next thing he knew, officers packed up Roscoe's stuff and removed him from the pod.

As to the credibility of these witnesses, it is difficult to evaluate. Their testimony was brief. Each of them has been convicted of a felony and at least some admitted to disciplinary offenses while at Red Onion that involved lying, cheating, or stealing. The court also notes that Roscoe was permitted to meet with each of them briefly before his testimony. Overall, though, the court disbelieves them to the extent that they claim Sgt. Phillips denied Roscoe informal complaint forms (and threatened to send him to segregation for requesting them) and to the extent that they testified that Roscoe was not kicking the cell door on January 7. The court believes that there was a commotion, and believes that the inmates likely heard Phillips talking about sending Roscoe to segregation for his behavior.

## G.  Officer James D. Bentley

At the time of trial, Bentley had worked for VDOC for approximately 23 years.  He testified about his investigation into Roscoe's PREA complaint.  Roscoe called the PREA hotline on January 11.  On January 18, Bentley received an email notifying him about the complaint, and he interviewed Roscoe and his cellmate, Perry.  Bentley obtained written statements from both of them, as well as from Stevens.  Before each of the inmates gave his written statement, Bentley warned him not to make false allegations or statements.  Bentley admitted, though, that he did not provide the same warning to Stevens and that he "probably should" provide that same warning to correctional officers he is interviewing.

14

The PREA investigative report is in evidence as Plaintiff's Exhibit 8.  It includes Roscoe's written statement, which does not mention anything about kicking the door.  It simply states that he asked Phillips and Stevens during their rounds for an informal complaint and Phillips said she would lock him up.  Then, when Stevens came to his door, he said, "Roscoe I don't know why your [sic] mad about rec it give you more time to f**k your celly."  Roscoe walked away but Sevens came back and "began to trade more unpresantry[sic] about how [Roscoe] was having sex with [his] celly," resulting in an argument.  (Pl.'s Ex. 8 at 7.)

His cellmate, Perry's written statement said:

> Officer Stevens came to ask E. Roscoe why he was kicking the door[.] Roscoe stated how am I kicking the door laying in bed[.] Officer Stevens stated for E. Roscoe to come to the door so that he can hear him[.] [S]o Roscoe got out of bed to go to the door[.] [W]hile at the door officer Stevens made threats to Roscoe how he should come in the cell to beat him and stated to him that they need to spend some one on one time together and began to lick his lips and started smiling."

(*Id.* at 8.)  In his written statement, Perry stated that he could hear the conversation between Roscoe and Stevens and that his statement was true and accurate. (*Id.*)  When Bentley confronted Perry about the fact that his and Roscoe's written statements were different, Perry admitted that they were "completely" different.  (*Id.*)  Bentley also did not believe that any portion of Perry's statement was sexual, noting that it did not include any overtly sexual statements and that people lick their lips for all types of non-sexual reasons.

Bentley also obtained a written statement from Stevens, who stated that he went to Roscoe's cell because Roscoe was kicking the cell door.  Stevens asked Roscoe what was wrong, and Roscoe became violent and threatened Stevens and Perrigan, stating that he wanted them to open the cell door so he could "whip [their] ass."  Captain Still and Sergeant Phillips were notified, and Still ordered Roscoe to be placed in a segregation cell.  When Stevens and Perrigan went to the cell to retrieve Roscoe's property, offender Perry made threatening remarks to them.

15

Again, they notified Captain Still, who ordered Perry to be placed into segregation, as well. Stevens stated that no sexual remarks were made to Roscoe or Perry at any time.

Based on the discrepancies in the statements between Perry and Roscoe as to what Stevens allegedly said, Stevens' denial that he made any sexual statements whatsoever, and the fact that the allegations by Roscoe were made on the same date that both he and Perry were placed in segregation as a result of interactions with Stevens (thereby giving both Roscoe and Perry a motive to falsely accuse Stevens), Bentley deemed Roscoe's PREA complaint unfounded. He also concluded that both Perry and Roscoe should be charged with disciplinary violations for making false statements against an officer.

At trial, Roscoe questioned Bentley about VDOC's Operating Procedure 038.3, which has PREA as its subject heading. That OP says that a prisoner who makes a false PREA report "may be charged with a disciplinary offense if it is determined the report was made in bad faith following consultation with the PREA analyst." (Pl.'s Ex. 1, at 8.) From this, Roscoe alleges that a disciplinary charge may result only if the report was made in bad faith, and he testified that Bentley never told him that Bentley thought his complaint was filed "in bad faith."

Although Bentley did not use the word "in bad faith" in his report, he did find the complaint unfounded. The other two findings that were options were "substantiated," which meant there was enough evidence to prove that the incident did occur, and "unsubstantiated," which meant there was not enough evidence to determine whether the incident did or did not happen. Unfounded, by contrast, meant that Bentley had concluded the incident did not occur as alleged by Roscoe.[6]

---

[6] Bentley's interpretation of those terms was consistent with VDOC OP 038.3, with the subject heading of "Prison Rape Elimination Act." That document defines "unfounded" as an allegation that was "determined to not have occurred." (Pl.'s Ex. 1 at 28.) This is distinguished from "unsubstantiated," which means that "the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred." (*Id.*)

Nonetheless, upon questioning by Roscoe, Bentley also admitted that, because "anything is possible," it was possible that Perry heard comments during one cell visit by Stevens and Roscoe heard different comments on another visit; thus, it was possible that both were telling the truth. But Bentley noted that Perry did not indicate that there was any other time that officers came to the door that he did not hear what was said.

After completing his report, Bentley gave it to the lieutenant investigator at Red Onion, who was Lieutenant Fannin. Fannin sent it to the PREA coordinator at Red Onion, who was Jessica King. King then reviewed it and signed off on it. Then she sent it to Tammy Barbetto, the PREA analyst for the Western Region at the time, who also agreed that Roscoe's report was unfounded. Ms. Barbetto determined that the report was made in bad faith and, in a February 13, 2018 email, she approved Bentley's request to charge both Roscoe and Perry with a disciplinary offense. (Defs.' Ex. 1.) As a result, Bentley filed disciplinary charge ROSP-2018-0220 against Roscoe on February 13, 2018, for making a false statement against Officer Stevens. (Pl.'s Ex. 6.)

Hearing Officer Misty Counts found Roscoe guilty of that disciplinary charge and imposed a $15 fine.[7] (*Id.*)

## H. Other Witnesses (Mullins, Counts, Barbetto, Elam)

The testimony of other witnesses, to the extent it has direct bearing on issues other than damages, established only minor points. For example, Larry Mullins, a hearing officer, testified that he dismissed the disciplinary charge against Roscoe brought by Perrigan because Perrigan could not identify Roscoe as the person who was kicking the door. That information is also before the court as part of Plaintiff's Exhibit 4 and the audio recording of the disciplinary hearing. (Pl.'s Ex. 24, Part 2.)

---

[7] Although Roscoe's complaint in this case alleged that Counts violated his due process rights during the disciplinary proceeding, Roscoe's due process claim did not survive summary judgment.

As noted, Misty Counts was the hearing officer for the disciplinary charge brought by Officer Bentley. She determined that it was founded and imposed a $15 fine on Roscoe. At trial, she initially equated unfounded and bad faith, but upon reviewing the policy as plaintiff questioned her, she admitted that the two terms had different definitions under the policy. In any event, her determination as to the charge has no bearing on whether defendant Bentley had a retaliatory motive in bringing it.

Tammy Barbetto testified that she gave approval for bringing the disciplinary charge for making a false PREA report because she believed Roscoe's allegation was unfounded, which in her opinion, meant false. She testified that *any* false allegation is made in bad faith and she believed there was no validity to his allegation based on reading the report. She stated that the primary reason for her decision was that Roscoe's statement's and his cellmate's statements about what had happened were "totally opposite."

Marcus Elam, who has been a VDOC employee for more than twenty-seven years, testified that his office reviewed Roscoe's appeal of his grievance in which he claimed that Bentley retaliated against him by filing the disciplinary charge. His office upheld the warden's decision that the grievance was unfounded. Elam also offered background information about the grievance process generally, his role in it, and about retaliation by officers within VDOC.[8]

### III. FINDINGS OF FACT

Based on the foregoing testimony and evidence and the court's evaluation of the credibility of the witnesses, the court makes the following findings of fact:

---

[8] There was some testimony from different witnesses concerning whether or not officers at Red Onion generally retaliated against plaintiffs, and several witnesses denied that such retaliation occurred. In addition to offering some witness testimony to the contrary, Roscoe also offered an opinion in a prior case, and the court took judicial notice of it: *Roscoe v. Collins*, No. 7:17cv00494 (W.D. Va. June 26, 2018). All of this evidence, however, is of little value in determining the primary issue in this case: whether defendants Perrigan and Bentley retaliated against plaintiff as to the specific disciplinary charges at issue. Thus, the court gives it no weight.

1. On January 7, 2018, defendant Officer Perrigan heard and saw Roscoe's door being kicked and believed Roscoe was the individual kicking it.  Sgt. Phillips and Officer Stevens also heard Roscoe's door being kicked and saw it vibrating at a time that Roscoe was standing in the cell directly in front of the door.

2. Roscoe was being disruptive in the pod at some point that evening, and he threatened Officers Perrigan and Stevens.

3. It is unclear whether and when Phillips, Perrigan, and Stevens discussed the filing of a charge against Roscoe and, if so, who should file it.  In any event, at some point that evening, Phillips requested that Captain Still authorize removing Roscoe from the pod and transferring him to segregation.

4. Still approved Roscoe's transfer to segregation, and Perrigan and Stevens removed Roscoe from his cell and transported him to segregation.

5. At no time on January 7 did Phillips, Perrigan, or Stevens refuse to give Roscoe an informal complaint form.  It is possible that Roscoe asked for one and that Phillips did not have one on her person, so she could not give one to him then.  She did not, however, refuse to give him one.

6. Phillips did not take any type of adverse action against Roscoe as a result of his requesting an informal complaint.  She would have given him (or agreed to get him one) had he requested one.

7. Perrigan filed disciplinary charge ROSP 2018-0020 against Roscoe, which charged him with a 120B offense, "tampering with a security device" based on Roscoe's kicking of his cell door.

8. During the disciplinary hearing for that charge, held on January 24, 2018, Perrigan testified that he never saw Roscoe kick the cell door of B117 on January 7, 2018.

9.  That disciplinary charge was dismissed because Perrigan could not say that Roscoe was the offender who was kicking the door of cell B-117.

10. At the time he filed the charge, it is unclear whether Perrigan knew that Roscoe intended to file a PREA complaint against Stevens.

11. Perrigan did not file the charge, in whole or in part, to retaliate against Roscoe, either for asking for informal complaint forms or for stating that he wanted to make a PREA complaint against Stevens (assuming that was said).

12. Perrigan would have filed the charge regarding Roscoe kicking the door even if he did not know Roscoe wanted an informal complaint form or that Roscoe intended to file a PREA report.  The primary reason that Perrigan filed the report was because Roscoe had been disruptive and had been kicking the door.

13. On January 11, Roscoe made a call to the PREA hotline and lodged a complaint arising from Stevens's alleged comments on January 7, 2018.

14. Bentley began his investigation into Roscoe's PREA complaint.  As part of his investigation, he interviewed and obtained written statements from Roscoe, from Perry, (Roscoe's cellmate on January 7), and from Stevens.

15. Bentley warned Roscoe and Perry, but not Stevens, that they must give truthful testimony.

16. At the conclusion of his investigation, Bentley deemed Roscoe's PREA complaint unfounded.   According to Bentley, an unfounded charge is one that is determined to be false.  If Bentley had deemed it "unsubstantiated," that would have meant it was a charge that Bentley could not determine was true based on a lack of convincing evidence, but that there was insufficient evidence to conclude was true.

17. In large part, Bentley's determination was based on the fact that the content of Roscoe's and Perry's statements were strikingly different.

18. Bentley did not consider the possibility that there had been two different occasions when Stevens had come to the cell and that Roscoe was reporting what he had heard on one of those visits and Perry was reporting what was said on the other occasion.

19. Bentley believed that Roscoe brought the PREA claim against Stevens not in good faith and believed that Roscoe's statement given in the interview was false.

20. Bentley noted (and had no reason to question) that the PREA report was made after a disciplinary charge was filed against Roscoe and after he was moved to segregation as the result of his interactions with Stevens (along with Perrigan and Phillips) on January 7. This supported Bentley's belief that Roscoe's allegations against Stevens were fabricated.

21. As part of Bentley's PREA report, he stated that he believed disciplinary charges should be brought against Roscoe and Perry for making a false statement and accusation.

22. Bentley's PREA report was subsequently approved (or passed on without any significant alteration) by three individuals: (1) Investigator Fannin, Bentley's supervisor; (2) Jessica King, the PREA coordinator at Red Onion; and (3) Tammy Barbetto, VDOC's PREA Analyst for the Western Region.

23. Barbetto's approval was required for Bentley to bring charges against Roscoe or Perry. She gave approval for filing of disciplinary charges against both Roscoe and Perry.

24. Barbetto gave such approval because she believed that Roscoe's PREA report was unfounded and brought in bad faith and that the statement he gave to Bentley was false. She did not give her approval in order to retaliate against Roscoe for making a PREA complaint; she gave that approval because she believed Roscoe had made a *false* PREA complaint.

25. On February 13, 2018, Defendant Bentley filed disciplinary offense ROSP-2018-0220 against Roscoe.

26. Bentley did not file the disciplinary charge to retaliate against Roscoe for making a PREA complaint; he filed the charge because he believed Roscoe made a *false* PREA complaint.

## IV.  CONCLUSIONS OF LAW

To succeed on each of his First Amendment retaliation claims, Roscoe must establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct."  *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy*, 858 F.3d 239, 249) (4th Cir. 2017)) (alterations omitted).

The court concludes that Roscoe has established the first and second of these elements by a preponderance of the evidence.  As to the first element, prisoners have a "First Amendment right to be free from retaliation for filing a grievance," *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017), and defendants previously have acknowledged that Roscoe's conduct in making a PREA complaint is protected conduct under the First Amendment.  (Mem. Supp. Mot. Summ. J. 12 (citing *Booker*, 855 F.3d at 542–45).)   Thus, Roscoe's report of alleged misconduct by staff, whether sexual in nature or not, constitutes activity protected by the First Amendment.

With regard to the second element of this claim, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  The filing of a disciplinary charge against a prisoner, especially where it resulted in—or contributed to—the prisoner's transfer from general

population to the much more restrictive environment of a segregated housing unit, is a sufficient adverse action. *See Booker v. S.C. Dep't of Corrections*,  583 F. App'x 43, 44 (4th Cir. 2014) ("*Booker I*") (concluding that the filing of a false disciplinary charge unsupported by any evidence warranting that charge "would likely deter prisoners of ordinary firmness from exercising their First Amendment rights").[9]

Ultimately, though, Roscoe's claims fail because he has failed to establish the third element of causation.  With regard to retaliation claims in the prison context, the Fourth Circuit has directed district courts to apply the "same-decision test" of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), in determining the causation element. *Martin*, 977 F.3d at 299.  Because the factual scenarios differ as to Roscoe's claim against each defendant, the analysis as to each is slightly different.

As to Perrigan, the court concludes that the standard *Mt. Healthy* analysis is applicable. Specifically, once the prisoner-plaintiff shows that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action," then the burden shifts to the defendant to prove a permissible basis for taking that action. *Id.* at 300.  "'If the defendant fails to carry that burden, the inference is that 'but for' causation . . . has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant.'" *Id.* at 299 (quoting *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011)).

The court does not conclude that Roscoe has established even his prima facie case against Perrigan, because he has failed to show that his asking for an informal complaint, or saying he

---

[9]   The court has not concluded that the disciplinary charges here were false.  Indeed, as to the charge brought by Perrigan, the court already has found that Roscoe was, in fact, kicking the door.  The fact that the disciplinary charge was later dismissed, for want of evidence, does not change that fact.  Moreover, Roscoe has not shown any good reason why Perrigan, Stevens, and Phillips would make up the fact that he was kicking his door, and the court does not believe that they would do so—or did so do—simply because he asked for informal complaint forms or even if he said he was going to file a PREA report.  Thus, Perrigan's charge against Roscoe was not false.

Likewise, the court has found that Stevens did not make the sexually suggestive statements attributed to him.  Thus, the court also concludes that Bentley's charge against Roscoe was not a "false" disciplinary report.

was going to file a PREA complaint was a "substantial or motivating" factor in Perrigan's decision to file the disciplinary charge.  But even assuming, for purposes of its decision, that Roscoe made that showing, Phillips, Stevens, and Perrigan all testified that Roscoe was kicking the door and being disruptive, and the court has found that to be true.  The court also has found that Perrigan would have filed the charge even in the absence of requests for informal complaints or a threatened PREA report.  Thus, Perrigan has met his burden of showing a permissible, non-retaliatory basis for filing the charge.  As such, the record does not show but-for causation.  Perrigan is entitled to judgment in his favor.

As to Bentley's bringing of the disciplinary charge for filing a false PREA complaint, this is what is described as a "unitary event" retaliation claim.  *Martin*, 977 F.3d at 303.  As the *Martin* court explained, in "unitary event" cases, "the plaintiff's protected conduct is a single event "that could prompt either a permissible or an impermissible reason on the part of the defendant to act."  *Id.* (citation omitted).  As an example, the *Martin* case pointed to *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Co.*, 77 F.3d 26, 33 (2d Cir. 1996).  In *Greenwich*, "the defendant's adverse action—filing counterclaims—undisputedly flowed from the plaintiff's protected conduct—filing a lawsuit."  *Id.* (citing *Greenwich*, 77 F.3d at 32).  Likewise, in *Martin* itself, the plaintiff prisoner was moved to segregation after filing a grievance, but according to defendant, she moved plaintiff to protect him while the grievance was investigated.  Thus, "Martin's placement in segregation undisputedly flowed from his grievance."  *Id.*

In situations involving unitary events, retaliation claims "'require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct.'"  *Id.* (quoting *Greenwich*, 77 F.3d at 33).  "To wit, in 'unitary event' retaliation claims, the same decision test asks not whether the defendant would have

24

reached the same decision absent the plaintiff's protected conduct, but whether the defendant would have reached the same decision absent a retaliatory motive." *Id.* at 303–04.

The court easily concludes that there is no credible or convincing evidence that Bentley harbored any retaliatory motive toward Roscoe.  As noted, the evidence establishes that Bentley believed Roscoe has made an unfounded report about Stevens and that this warranted a disciplinary charge.  His report went through the proper channels, and was reviewed by three other persons.  The final approval for bringing the charge came from Tammy Barbetto, and the court has found that neither she nor Bentley had any retaliatory motive.

Roscoe repeatedly sought to show that the statements themselves by Roscoe and Perry do not mean that they were not both telling the truth.  He argues that there were two separate times that Stevens came to the cell and that the conversation reported by Roscoe occurred during one of those occasions and the conversation reported by Perry occurred during the other.  Or he suggests that perhaps Perry misperceived what was said or what was occurring.  But even if—contrary to the court's findings—Roscoe and Perry were telling the truth, that does not mean that Bentley acted with retaliatory animus.

Bentley perhaps could have delved deeper into the evidence and could have questioned each inmate about how many times Stevens came to the cell and what he said each time.  But there is simply no evidence that suggests Bentley brought the disciplinary charge for any retaliatory reasons.  He was faced with two different—and inconsistent--versions of an incident given by two inmates and a statement from the alleged perpetrator, a correctional officer, that contradicted both versions.  Moreover, interactions with that officer had resulted in both Roscoe and Perry being sent to segregation four days before the PREA complaint was made.  It was entirely reasonable for him to conclude—even if he was incorrect—that the inmates were not telling the truth.  In any event, Roscoe has not showed that Bentley believed Roscoe was telling

25

the truth or that he brought the disciplinary charges solely to retaliate against Roscoe for filing a PREA complaint.  Accordingly, Roscoe has failed to prove his claim against Bentley.

For all of these reasons, the court will enter judgment in Bentley's favor.

## V.  CONCLUSION

Based on the foregoing, the court concludes that Roscoe has not met his burden of proving by a preponderance of evidence that either defendant acted with retaliatory animus in filing the respective disciplinary charges against him.  Accordingly, the court will enter judgment in favor of defendants and against plaintiff.

Entered: September 20, 2021.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

26